IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNILOC USA, INC.; and UNILOC LUXEMBOURG, S.A.,<br><br>Plaintiffs,<br><br>v.<br><br>APPLE INC.,<br><br>Defendant. | No. C 18-00358 WHA<br><br>**ORDER GRANTING MOTION FOR JUDGMENT ON THE PLEADINGS** |

## INTRODUCTION

In this patent infringement action, defendant moves for judgment on the pleadings on the basis that the sole asserted patent herein remains directed to patent-ineligible subject matter. The motion is **GRANTED**.

## STATEMENT

Plaintiffs Uniloc USA, Inc., and Uniloc Luxembourg, S.A. (collectively, "Uniloc"), accuse defendant Apple Inc. of both directly and indirectly infringing U.S. Patent No. 6,661,203 ("the '203 patent"), either literally or under the doctrine of equivalents (Dkt. No. 1 ¶¶ 11, 13).

The '203 patent claims "[a] method and apparatus for controlling the charge and discharge currents in a battery as a function of temperature" (Dkt. No. 1-2, Abstract). As the patent explains, the process of charging or discharging a rechargeable battery generates "a certain amount of internal heat" proportional to the amount of electrical current flowing through the battery. Devices powered by batteries also usually generate heat during operation. The

high temperatures potentially caused by the operation of batteries and adjacent circuitry create a "dilemma" for battery designers. If a designer maintains charge and discharge currents at higher levels with the expectation that the battery will operate at lower temperatures, then battery life and reliability may become compromised if the operating temperature increases. If, on the other hand, a designer maintains charge and discharge currents at lower levels with the expectation that the battery will operate at higher temperatures, then it may take too long for the battery to complete charging and discharging operations. The battery could be located "in a cooler environment" or supplemented with "additional cooling equipment" to counteract overheating, but according to the '203 patent this remains "undesirable due to increased cost, greater systems complexity, or reduced reliability," among other things (*id.* at 2:13–57).

The '203 patent describes its claimed invention, which purports to solve the foregoing problem, as follows (*id.* at 2:64–3:5):

> An apparatus for charging a battery according to its temperature . . . includes a charging circuit adapted to charge a battery and a temperature sensor positioned to sense a battery temperature, i.e., adjacent environmental temperature. The apparatus includes a controller coupled to the temperature sensor and the charging circuit. The controller operates to set the charging current in accordance with the sensed temperature.

The claimed invention never teaches any particular algorithm, parameters, variables, or values for controlling current as a function of temperature. Despite being dressed up with "illustrative" tables and flow charts presenting hypothetical examples of specific implementation, the '203 patent discloses no inventive source code, formula, or circuitry. Instead, the claimed invention remains limited to the high-level concept described above. At a similar level of generality, the '203 patent describes several broad "refinements" of the claimed invention — including, as nonexhaustive hypothetical examples, controllers that continuously or periodically set charging currents according to sensed temperatures, controllers that reference memorized tables to set the appropriate currents for specific temperatures, and controllers that set currents at maximum or minimum values (including reducing current flow to zero) based on predetermined threshold temperature values (*see id.* at 3:6–25).

Furthermore, the '203 patent expressly acknowledges how the hardware that would be used to implement its claimed invention existed in the prior art. Specifically, the patent describes at length an "illustrative embodiment" featuring a "smart battery" with which "the present invention is implemented to allow the system to extract maximum performance from the battery without exceeding safe operational constraints for the battery." According to the patent, the smart battery "industry standard" includes a temperature sensor and a controller with the ability to measure and communicate certain information about the battery's operation, including "terminal voltage, the rate of current flow into or out of the battery, the charges state . . . and the temperature of the battery" (*id.* at 4:41–5:6). The hardware components may be any of a variety "understood by those possessing ordinary skill in the art" (*id.* at 5:51–60).

To repeat, the '203 patent itself makes clear that both the aforementioned operational constraints of battery design and the hardware used to implement said design predate the claimed invention, which remains limited to the high-level concept of adjusting a battery's current flow based on its temperature. According to the '203 patent, the claimed invention "allows designers to move closer to the absolute limits" of "operational constraints" known to those skilled in the art while avoiding "deleterious effects" like "reduced battery life, reduced battery capacity, and certain potentials for dangerous situations including overheating, fire, and chemical leakage," and "while still maintaining maximum performance from the battery and the system into which it is installed" (*id.* at 3:61–4:12).

Uniloc alleges Apple products infringe the '203 patent because they "incorporate rechargeable batteries having a temperature sensor that, *inter alia*, causes the device to cease charging when the battery temperature exceeds a threshold level." Put differently, Apple products charge batteries and use sensors to monitor the temperatures of their batteries to avoid overheating (Dkt. No. 1 ¶¶ 10, 12). This action originated in the Eastern District of Texas in May 2017 and transferred to our district in January 2018. It was related to six other patent infringement cases initiated by Uniloc and reassigned to the undersigned judge.

Apple now moves for judgment on the pleadings (Dkt. No. 53). This order follows full briefing and oral argument.

## ANALYSIS

**1. LEGAL STANDARDS.**

Federal Rule of Civil Procedure 12(c) provides that, "[a]fter the pleadings are closed — but early enough not to delay trial — a party may move for judgment on the pleadings." Analysis under FRCP 12(c) is "substantially identical" to analysis under FRCP 12(b)(6). Under both, "a court must determine whether the facts alleged in the complaint, taken as true, entitle the plaintiff to a legal remedy." *Chavez v. United States*, 683 F.3d 1102, 1108 (9th Cir. 2012). Both sides agree that the pleading standards set forth by *Bell Atlantic Corporation v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), govern Uniloc's claim for relief (*see* Dkt. Nos. 53 at 6, 60 at 7–8).

Here, the complaint asserts "at least" claims 1, 8, and 16 of the '203 patent. In briefing on the instant motion, Uniloc indicates it also asserts claims 15 and 23 of the '203 patent, which would appear in its forthcoming disclosures and infringement contentions pursuant to our Patent Local Rules (*see* Dkt. No. 60 at 1 & n.1). Apple points out — and Uniloc does not disagree — that claims 8 and 16 are representative for purposes of the instant motion. Claim 8 recites (Dkt. No. 1-2 at 8:1–15 (emphasis added)):

> An apparatus for exercising a battery, comprising
>
> > a charging circuit having a charging current output coupled to the battery;
> >
> > a temperature sensor positioned to sense a temperature related to the battery temperature;
> >
> > a discharging circuit having a discharging current input coupled to the battery; and
> >
> > a controller coupled to said temperature sensor, said charging circuit, and said discharging circuit, said controller operable to set said charging current *in accordance with* said temperature, and operable to set said discharging current *in accordance with* said temperature, said controller being operable to set said discharging current to zero when said temperature is higher than a first predetermined threshold value.

Similarly, claim 16 recites (*id.* at 8:42–49 (emphasis added)):

> A method of charging a battery, comprising the steps of:

4

    sensing a temperature related to the battery temperature;

    setting a charging current *in accordance with* said sensed temperature and setting said charging current to zero when said temperature is higher than a first predetermined threshold value; and

    charging the battery at said charging current.

Section 101 of Title 35 of the United States Code defines patent-eligible subject matter as "any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof." Under well-established Supreme Court precedent, laws of nature, natural phenomena, and abstract ideas remain patent-ineligible under Section 101. *See, e.g.*, *Ass'n for Molecular Pathology v. Myriad Genetics, Inc.*, 569 U.S. 576, 589 (2013) (citations and quotations omitted). The Supreme Court has set forth a two-step "framework for distinguishing patents that claim laws of nature, natural phenomena, and abstract ideas from those that claim patent-eligible applications of those concepts." Under this framework, a court must first "determine whether the claims at issue are directed to one of those patent-ineligible concepts." If so, then the court must further "consider the elements of each claim both individually and 'as an ordered combination' to determine whether the additional elements 'transform the nature of the claim' into a patent-eligible application." *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 134 S. Ct. 2347, 2355 (2014) (quoting *Mayo Collaborative Servs. v. Prometheus Labs., Inc.*, 566 U.S. 66 (2012)).

### 2. *ALICE* STEP ONE.

Apple contends the '203 patent remains directed to a patent-ineligible concept — namely, adjusting a battery's current flow based on its temperature (*see* Dkt. No. 53 at 6–13). This order agrees.

Supreme Court precedent that predates *Alice* but nevertheless remains instructive supports Apple's position. For example, *Parker v. Flook* held unpatentable a formula representing "a new and presumably better method for calculating alarm limit values" to signal the presence of abnormal conditions in catalytic conversions of hydrocarbons because the chemical processes involved were well-known, as were "the practice of monitoring the chemical process variables, the use of alarm limits to trigger alarms, the notion that alarm limit

5

1 values must be recomputed and readjusted, and the use of computers for 'automatic monitoring-
2 alarming,'" and the patent in question did not explain how to manage any specific processes,
3 variables, or alarm systems. *See* 437 U.S. 584, 585–86, 594–95 (1978). *Bilski v. Kappos* held
4 unpatentable "the basic concept of hedging" against the financial risk of price fluctuations in the
5 energy market because risk-hedging was "a fundamental economic practice long prevalent in
6 our system of commerce and taught in any introductory finance class," and thus an abstract
7 idea. *See* 561 U.S. 593, 598–99, 611–12 (2010). And *Mayo* held unpatentable processes that
8 identified relatively precise correlations between metabolite values in a patient's bloodstream
9 and the likely harm or ineffectiveness of certain dosages of thiopurine drugs because doctors
10 and scientists in the field at the time already generally understood the metabolite-dosage
11 relationship, and the claimed invention amounted to nothing more than recitation of the
12 relationship with the added instruction to "apply it." *See* 566 U.S. at 73–74, 77–80.

13 The '203 patent does not even disclose a novel formula or algorithm like that in *Flook*,
14 but similarly claims a method for navigating admittedly well-known operational constraints
15 with admittedly industry-standard hardware while supplying no details about how to manage
16 specific values, variables, processes, or systems. As the patent in *Bilski* claimed a basic,
17 fundamental practice long prevalent in economics and finance, the '203 patent here claims a
18 basic, fundamental practice — adjusting electrical current flow to control the heat it generates
19 — long prevalent in physics and engineering. And, like the patent in *Mayo*, the '203 patent
20 essentially recites a well-understood, plainly patent-ineligible relationship — here, electricity
21 and heat instead of thiopurine drug dosages and metabolite values — with the added instruction
22 to "apply it" by monitoring and adjusting one factor in the relationship to control the other. In
23 short, the '203 patent remains directed to a concept at least as well-known and fundamental as
24 the concepts at issue in *Flook*, *Bilski*, and *Mayo*. Those binding precedents held such concepts
25 to be patent-ineligible subject matter, and the same result obtains here.

26 Uniloc does not address *Flook* or *Bilski* but purports to distinguish *Mayo* on the basis
27 that the claims in *Mayo* "merely covered measuring the [metabolite-dosage] correlation,"
28 whereas the asserted claims here "do not recite and are not directed to an expression of the

6

abstract idea that current should be related to temperature," but "require a charging circuit for charging a battery; a temperature sensor to sense a battery temperature; and a controller to control the charging circuit in accordance with the temperature" (*see* Dkt. No. 60 at 12–13). Uniloc's point in reciting the specific components and functions of its claimed invention remains unclear but seems to be that its claimed invention, unlike the one in *Mayo*, does something more than merely "measuring" a natural relationship.

*First*, this mischaracterizes the claimed invention in *Mayo*, which not only measured the metabolite-dosage relationship but also explained that low metabolite levels indicated increased drug dosages while high metabolite levels indicated decreased drug dosages — much like how the claimed invention here explains that low temperatures indicate increased electrical current flow while high temperatures indicate decreased electrical current flow. *See* 566 U.S. at 74–75.

*Second*, Uniloc's assertion that its claimed invention is "not directed to an expression of the abstract idea that current should be related to temperature" is plainly false. The very first sentence of the '203 patent describes the claimed invention as "[a] method and apparatus for controlling the charge and discharge *currents in a battery as a function of temperature*" (Dkt. No. 1-2, Abstract (emphasis added)). Explanations of the correlation between temperature and current flow, and how to monitor and control the former by manipulating the latter, saturate the rest of the patent and give rise to every advantage claimed by the patent over the prior art. It beggars belief to suggest that Uniloc's claimed invention, viewed as a whole, has more to do with generic hypothetical assemblies of industry-standard hardware components than with the abstract idea that animates them.

Uniloc contends *Diamond v. Diehr*, 450 U.S. 175 (1981), more closely resembles our facts and supports Uniloc's position (*see* Dkt. No. 60 at 10–14). *Diehr* examined a detailed process invented to mold raw rubber into perfectly-cured products by constantly measuring the temperature inside the mold, repeatedly recalculating the appropriate cure time, and setting the press to open when the calculated cure time equaled actual time elapsed. Although it calculated appropriate cure time using a well-known equation, the claimed process was new in the art, deviated from conventional industry practice, and solved the longstanding industry problem of

7

accounting for the uncontrollable variable of the temperature inside the press in calculating the perfect cure time. 450 U.S. at 177–79. Under those facts, *Diehr* concluded:

> [W]e think that a physical and chemical process for molding precision synthetic rubber products falls within the § 101 categories of possibly patentable subject matter. That respondents' claims involve the transformation of an article, in this case raw, uncured synthetic rubber, into a different state or thing cannot be disputed. The respondents' claims describe in detail a step-by-step method for accomplishing such, beginning with the loading of a mold with raw, uncured rubber and ending with the eventual opening of the press at the conclusion of the cure. Industrial processes such as this are the types which have historically been eligible to receive the protection of our patent laws.

*Id.* at 184.

Significantly, *Diehr* distinguished *Flook* on the basis that the rubber-curing method in *Diehr* claimed a specific manufacturing process with all its detailed steps instead of seeking to preempt use of an unpatentable formula like that claimed in *Flook*. *Id.* at 186–87. In doing so, *Diehr* specifically recognized that limiting an otherwise patent-ineligible concept to a "particular technological environment" or tacking on "insignificant post-solution activity" does not transform said concept into a patentable process. But if a claimed invention, considered as a whole, performs "a function which the patent laws were designed to protect (*e.g.*, transforming or reducing an article to a different state or thing), then the claim satisfies the requirements of [Section] 101." *Id.* at 191–92. As the Federal Circuit put it in *Thales Visionix Inc. v. United States*, another decision cited by Uniloc, "In terms of the modern day *Alice* test, the *Diehr* claims were directed to an improvement in the rubber curing process, not a mathematical formula." 850 F.3d 1343, 1347–48 (Fed. Cir. 2017).

Here, in contrast, Uniloc does not claim a detailed step-by-step method to improve a historically-patentable industrial process that just happens to incorporate a well-known equation at one particular step. Rather, Uniloc claims sweeping, abstract swaths of possible methods and apparatuses using admittedly industry-standard hardware to implement the patent-ineligible concept that battery designers can adjust a battery's current flow to control its temperature. On these facts, *Flook*, *Bilski*, and *Mayo* remain the better authorities on point and compel the

8

conclusion that, under *Alice* step one, Uniloc's claims are directed to patent-ineligible subject matter. This order therefore proceeds to step two.

### 3. *ALICE* STEP TWO.

The Supreme Court has described step two as "a search for an inventive concept — *i.e.*, an element or combination of elements that is sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the ineligible concept itself." *Alice*, 134 S. Ct. at 2355 (quotations and citation omitted). Apple contends the '203 patent contains no inventive concept sufficient to transform its patent-ineligible subject matter into a patentable invention under *Alice* step two (Dkt. No. 53 at 13–18). This order agrees.

Uniloc makes several attempts to identify an inventive concept in its claimed invention, none persuasive. *First*, Uniloc compares its claimed invention to that examined in *Thales* (Dkt. No. 60 at 15–16). This comparison is a nonstarter, since *Thales* found the subject matter in question patent-eligible under *Alice* step one and never reached step two. *See* 850 F.3d at 1349. But even if *Thales* could be read to apply to *Alice* step two, its analysis — which, as Uniloc points out, closely followed *Diehr* — remains inapplicable to our facts. *See ibid.* (claims specifying a particular method of using data from a particular "unconventional configuration of sensors" were "directed to a new and useful technique . . . to more efficiently track an object on a moving platform," not to a mathematical equation or other abstract idea). Contrary to Uniloc's suggestion, the '203 patent teaches no inventive "particular configuration of sensors and method of using the raw data" comparable to that in *Thales* (*see* Dkt. No. 60 at 15–16).

*Second*, Uniloc argues that its claims pass the machine-or-transformation test because the claimed invention "includes a temperature sensor that transforms heat into an electronic signal . . . and a controller which sets current flow . . . to and/or from a battery, thereby balancing the internally generated heat temperature with the local environment. Thus, the [claims] include specific limitations that are beyond what is well understood and conventional in the predicting user future locations field and are beyond generally linking the abstract idea to a computer environment" (*id.* at 16). This argument is nonsensical. A temperature sensor does not "transform" heat into electricity. A controller does not "transform" anything by setting

9

current flow as a function of corresponding heat generation. The asserted claims have nothing to do with "predicting user future locations." And it remains unclear how the claimed invention does anything beyond "generally linking" an abstract idea to conventional hardware.

*Third*, Uniloc contends its claims would not "preempt the fundamental concept of using temperature to control current in a battery" because "[t]he claims are specifically limited to the process of charging or exercising a battery" (*ibid.*). But Uniloc's own authorities recognize that limiting a patent-ineligible concept to a "particular technological environment" does not produce a patentable process. *See Diehr*, 450 U.S. at 191–92; *Thales*, 850 F.3d at 1347. Uniloc asserts in conclusory fashion that "'[c]harging or exercising a battery' is not one field of use out of other possible fields of use [but] is the invention's character" (Dkt. No. 60 at 18). But this is merely attorney argument. The gravamen of Uniloc's claimed invention is not the process of charging or exercising a battery but a method or apparatus for improving said process *by applying the basic concept that reducing a battery's electrical current flow also reduces its temperature*. The risk of monopolizing a patent-ineligible concept flows from that basic concept, not from the context of battery design.

In a similar vein, Uniloc contends its claims would not "preempt" a patent-ineligible concept because "[o]ne could easily contemplate numerous inventions that could use a different temperature to control current in a battery." For example, Uniloc suggests "one could increase the speed of a *battery* operated fan as ambient temperature increased," "monitor the temperature of an engine and shut it off when it overheated with a *battery* operated circuit," or "actuate a *battery* operated fire suppression system based on a compartment temperature" (emphasis added). These are counterfeit comparisons, superficially likened to the claimed invention herein by strategic injections of the word "battery" but ultimately irrelevant to the issues at hand. Insofar as Uniloc implies a meaningful distinction between monitoring *only* battery temperature versus monitoring the temperature of adjacent circuitry, the '203 patent itself belies any such distinction. As the '203 patent explains, the overheating problem it aims to solve arises from both the battery *and* the "adjacent circuitry" because "a battery may be subjected to heat energy produced by the device it powers as well as the heat the battery produces internally"

(Dkt. No. 1-2 at 2:25–33). Consistent with this explanation, and contrary to Uniloc, the '203 patent does not limit its claims to sensing *only* battery temperature but also encompasses sensing temperatures "*related to* the battery temperature" (*e.g.*, *id.* at 8:4–5, 44).

Or, perhaps Uniloc means to insinuate it could have claimed ownership over an even broader, more abstract concept — for example, *any* approach to operating *any* battery-powered system based on *any* relevant temperature, as opposed to merely adjusting a battery's electrical current flow to prevent overheating *of the battery itself* — so its claimed invention seems relatively modest and reasonable in comparison and should pass scrutiny. This reasoning would be specious. That the '203 patent could have reached even further into patent-ineligible territory does not somehow change the fact that, as it stands, it remains directed to a patent-ineligible concept. And, to repeat, limiting a patent-ineligible concept to a "particular technological environment" or tacking on "insignificant post-solution activity" does not transform it into a patentable process. *See, e.g.*, *Diehr*, 450 U.S. at 191–92.

*Fourth*, Uniloc argues that its claimed invention achieves improvements to battery technology relative to "prior art" with different hardware components, like "providing a cooling system" (Dkt. No. 60 at 17). This argument misses the point. The distinction Uniloc points out between its claimed invention and the prior art is not some improvement in hardware configuration but the switch from one underlying concept (adding a cooling system to counter heat generation) to another (reducing electrical current flow to reduce the heat it generates). The bottom line remains that any improvement achieved by Uniloc's claimed invention stems from mere recitation and application of a patent-ineligible concept.

In summary, based on the pleadings, Uniloc's claimed invention remains directed to patent-ineligible subject matter and contains no inventive concept sufficient to transform the nature of the claims into a patentable application. Apple is therefore entitled to judgment on the pleadings that the asserted claims in this action are invalid under Section 101 and *Alice*.

### 4. TIMING OF MOTION AND LEAVE TO AMEND.

Uniloc insists a factual issue precludes judgment on the pleadings because the parties disagree as to whether or not the claimed invention features "routine and conventional"

11

elements like hardware configurations (Dkt. No. 60 at 18–19). In support of its position, Uniloc cites the recently-issued *Berkheimer v. HP Inc.*, which held that "[t]he question of whether a claim element or combination of elements is well-understood, routine and conventional to a skilled artisan in the relevant field is a question of fact." 881 F.3d 1360, 1368 (Fed. Cir. 2018).

*Berkheimer*, however, also reiterated that "not every [Section] 101 determination contains genuine disputes over the underlying facts material to the [Section] 101 inquiry." It acknowledged that "[w]hether a claim recites patent eligible subject matter is a question of law which . . . has in many cases been resolved on motions to dismiss or summary judgment." It stressed that "[n]othing in this decision should be viewed as casting doubt on the propriety of those cases." *Ibid.* Contrary to Uniloc, the instant motion tees up no factual dispute over whether or not a claim element or combination of elements "is well-understood, routine and conventional to a skilled artisan in the relevant field." To the extent Uniloc refers to the hardware components and configurations identified in its claims, the '203 patent itself explains that those components and configurations were considered industry standard at the time of the claimed invention. To the extent Uniloc refers to the concept of adjusting a battery's electrical current flow to control its temperature, that concept, as stated, remains patent-ineligible.

Uniloc attempts to manufacture a factual question by arguing that it could get around the aforementioned roadblocks if allowed to proceed on the merits. This order disagrees. *First*, Uniloc points out that its claimed invention purports to improve "battery technology, including design, performance, balanced current flow, and long battery life," but those improvements all pertain to *results* — specifically, results flowing from an underlying patent-ineligible concept rather than from any specific hardware configuration disclosed by the '203 patent. This creates no factual dispute as to the routine and conventional nature of the implementing hardware, which the '203 patent itself reveals. *Second*, Uniloc inexplicably suggests the industry-standard smart battery described in the '203 patent is not prior art but merely "an illustrative embodiment of the *present invention*" (Dkt. No. 60 at 19 (emphasis in original)). This suggestion is baseless. Uniloc does not and cannot explain how "industry standard" technology could fall outside the realm of "prior art," or be considered anything other than routine and conventional.

Uniloc also insists that claim construction issues preclude judgment on the pleadings, but provides no concrete example of any such issue. The closest it comes is in the vague suggestion that "construction of terms like 'controller' and 'circuit' may result in requiring more structure than Apple's analysis permits" (Dkt. No. 60 at 20). But Uniloc never explains how the parties debate the meaning of "controller" or "circuit," much less how the outcome of any such debate could possibly alter the analysis herein.

Finally, in the event that Apple's motion is granted, Uniloc seeks leave to amend to expand on "details in the patent that support Uniloc's view that the claims as a whole are not routine and conventional" (Dkt. No. 60 at 20–21). The proposed amendment adds generic allegations to the effect that Uniloc's claimed invention represented a novel solution to a previously-unsolved industry problem (*see* Dkt. No. 60-4). The issue with Uniloc's patent, however, is not limited to "routine and conventional" hardware. Rather, the issue illuminated by this motion is that Uniloc's claimed invention simply recites a patent-ineligible idea as implemented by "industry standard" technology. *See Alice*, 134 S. Ct. at 2359–60 (claims that amount to "nothing significantly more" than an instruction to apply an abstract idea using "some unspecified, generic" technology do not describe a patentable invention). Uniloc's proposed amendment fails to cure this defect, which appears on the face of the '203 patent.

## CONCLUSION

For the foregoing reasons, defendant's motion for judgment on the pleadings is **GRANTED**. Leave to amend is denied as futile. Judgment will follow.

Any motion for attorney's fees shall be postponed until completion of at least the first round of the expedited summary judgment procedure set forth by the case management order in the related patent infringement actions.

**IT IS SO ORDERED.**

Dated: May 18, 2018.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE