**\*REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED\***

Michael T. Pieja (CA Bar No. 250351)
Alan E. Littmann (*pro hac vice*)
Jennifer Greenblatt (*pro hac vice*)
Doug Winnard (CA Bar No. 275420)
Andrew J. Rima (*pro hac vice*)
Emma C. Ross (*pro hac vice*)
Lauren Abendshien (*pro hac vice*)
GOLDMAN ISMAIL TOMASELLI
BRENNAN & BAUM LLP
200 South Wacker Dr., 22nd Floor
Chicago, IL 60606
Tel: (312) 681-6000
Fax: (312) 881-5191
mpieja@goldmanismail.com
alittmann@goldmanismail.com
jgreenblatt@goldmanismail.com
dwinnard@goldmanismail.com
arima@goldmanismail.com
eross@goldmanismail.com
labendshien@goldmanismail.com

*Attorneys for Defendant Apple Inc.*

(Additional counsel listed in signature block)

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| UNILOC USA, INC., et al.,<br><br>          Plaintiffs,<br><br>     v.<br><br>APPLE INC.,<br><br>          Defendant. | Case No.        3:18-cv-00358-WHA<br><br>**DEFENDANT APPLE INC.'S MOTION TO DISMISS FOR LACK OF SUBJECT-MATTER JURISDICTION**<br><br>JUDGE: Hon. William Alsup<br><br>DATE: Thursday, December 3, 2020<br>TIME: 8:00 a.m.<br>COURTROOM: 12, 19th Floor<br>JUDGE: Hon. William Alsup |

*REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED*

## NOTICE OF MOTION

**PLEASE TAKE NOTICE** that on Thursday, December 3, 2020, at 8:00 a.m., in Courtroom 12 of the United States District Court located at 450 Golden Gate Avenue, San Francisco, California, 94102, before the Honorable William Alsup, Defendant Apple Inc. ("Apple") will and hereby does respectfully move this Court for an order granting Apple's Motion to Dismiss for Lack of Subject-Matter Jurisdiction.

## STATEMENT OF RELIEF REQUESTED

Through this motion, Apple requests an order dismissing without prejudice the above-captioned action brought by Plaintiffs Uniloc USA, Inc. and Uniloc Luxembourg for lack of constitutional standing.

**\*REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED\***

## TABLE OF CONTENTS

NOTICE OF MOTION..........................................................................................................ii

STATEMENT OF RELIEF REQUESTED.........................................................................ii

TABLE OF AUTHORITIES ..............................................................................................iv

I.      INTRODUCTION ................................................................................................... 1

II.     FACTUAL BACKGROUND...................................................................................... 2

      A.      Uniloc USA And Uniloc Lux Grant Fortress A License To All Their Patents, Including The Right To Sublicense Third Parties.......................................... 2

      B.      Uniloc Triggers An Event Of Default On March 31, 2017 And Never Cures It ............................................................................................................ 4

III.    PROCEDURAL BACKGROUND ............................................................................... 4

IV.     LEGAL STANDARDS ............................................................................................. 5

V.      UNILOC TRIGGERED AN EVENT OF DEFAULT AND NEVER CURED IT ................... 6

      A.      Uniloc Triggered An Event Of Default Under The Express Terms Of The RSA......................................................................................................... 7

            1)      Parol Evidence Cannot Rewrite The Unambiguous Term "Event of Default"................................................................................... 7

            2)      The Drafting History Of The RSA Confirms That Uniloc Caused An Event Of Default ......................................................................... 8

            3)      Fortress's Failure To Act On Its Rights Does Not Negate The Event Of Default .................................................................................. 9

      B.      Uniloc Never Cured Or Otherwise Annulled Any Event Of Default ...................... 11

            1)      New Evidence Proves No Cure Occurred Or Could Have Occurred ........... 11

            2)      Fortress's Execution Of The Third Amendment Does Not Constitute A Cure ...................................................................................... 14

VI.     FORTRESS'S UNFETTERED SUBLICENSING RIGHT DEPRIVED UNILOC OF STANDING TO SUE . 15

VII.    UNILOC'S LACK OF CONSTITUTIONAL STANDING REQUIRES DISMISSAL ............................. 18

**\*REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED\***

## TABLE OF AUTHORITIES

**Cases**

*Acceleration Bay LLC v. Activision Blizzard, Inc.*,
   2017 WL 3668597 (D. Del. Aug. 24, 2017) ................................................................16

*Azure Networks, LLC v. CSR PLC*,
   771 F.3d 1336 (Fed. Cir. 2014),
   *vacated on other grounds*, 135 S. Ct. 1846 (2015) .......................................................6

*Bakalis v. Bakalis*,
   88 N.Y.S.3d 899 (N.Y. App. Div. 2018) ....................................................................13

*Bank of New York Mellon Trust Co., Nat'l Ass'n v. Solstice ABS CBO II, Ltd.*,
   910 F. Supp. 2d 629 (S.D.N.Y 2012) .................................................................12, 15

*Fairchild Semiconductor Corp. v. Power Integrations, Inc.*,
   630 F. Supp. 2d 365 (D. Del. 2007) ...........................................................................18

*Gaia House Mezz LLC v. State St. Bank & Tr. Co.*,
   720 F.3d 84 (2d Cir. 2013) ...........................................................................8, 9, 19

*Immunex Corp. v. Sandoz Inc.*,
   964 F.3d 1049 (Fed. Cir. 2020) ..................................................................................8

*In re Taddeo*,
   685 F.2d 24 (2d Cir. 1982) .......................................................................................12

*Jarecki v. Shung Moo Louie*,
   745 N.E.2d 1006 (Ct. App. N.Y. 2001) .......................................................................7

*Leite v. Crane Co.*,
   749 F.3d 1117 (9th Cir. 2014) ...............................................................................5, 6

*Lone Star Silicon Innovations LLC v. Nanya Technology Corp.*,
   925. F.3d 1225 (Fed. Cir. 2019) ..........................................................................17, 18

*Luminara Worldwide, LLC v. Liown Elecs. Co.*,
   814 F.3d 1343 (Fed. Cir. 2016) .......................................................................6, 16, 18

*Morrow v. Microsoft Corp.*,
   499 F.3d 1332 (Fed. Cir. 2007) ..........................................................................6, 18

*Paradise Creations, Inc. v. UV Sales, Inc.*,
   315 F.3d 1304 (Fed. Cir. 2003) ...............................................................................19

*Prima Tek II, L.L.C. v. A-Roo Co.*,
   222 F.3d 1372 (Fed. Cir. 2000) ...............................................................................16

**\*REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED\***

*Rite-Hite Corp. v. Kelly Co., Inc.,*
    56 F.3d 1538 (Fed. Cir. 1995)................................................................................16

*SEE, Inc. v. See Concept SAS,*
    2017 WL 768616 (E.D. Mich. Feb. 28, 2017) .........................................................12

*Sicom Sys., Ltd. v. Agilent Techs., Inc.,*
    427 F.3d 971 (Fed. Cir. 2005) ...................................................................................6

*Speedplay, Inc. v. Bebop, Inc.,*
    211 F.3d 1245 (Fed. Cir. 2000)................................................................................17

*Tech. Props. Ltd. LLC v. Canon Inc.,*
    2016 WL 4447142 (N.D. Cal. Aug. 24, 2016) ..........................................................6

*WiAV Sols. v. Motorola, Inc.,*
    631 F.3d 1257 (Fed. Cir. 2010)....................................................................6, 16, 17

**Other Authorities**

*Merriam-Webster's Collegiate Dictionary* 284 (10th ed. 1999) .....................................12

*The American Heritage Dictionary* 323 (11th ed. 2003)..................................................12

**\*REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED\***

I.   **INTRODUCTION**

The issues of constitutional standing raised in this motion are not new to the Court. As Apple argued in several related cases in this District[1], Plaintiffs Uniloc USA, Inc. ("Uniloc USA") and Uniloc Luxembourg ("Uniloc Lux") (collectively, "Uniloc"), created these issues through a complex and tangled web of agreements with their secured lender, Fortress Credit Co LLC ("Fortress"). (*See* Apple's 10/25/18 Mot. to Dismiss, Dkt. No. 135, *Uniloc USA, Inc. and Uniloc Luxembourg, S.A. v. Apple Inc.*, Case No. 3:18-cv-00360-WHA (N.D. Cal.) ("-360 Dkt.").) The key to cutting through this tangled web remains the question the Court posed before: "whether or not Uniloc defaulted and cured its obligations to Fortress." (Dkt. No. 133 at 2.) If Uniloc defaulted and did not cure that default, as Apple argues, Fortress held the right to license Apple to the patent-in-suit at the time Uniloc filed its complaint. Fortress's sublicensing right, in turn, rendered Uniloc's exclusionary rights illusory, depriving Uniloc of constitutional standing and requiring dismissal of this action.

The first part of the question—whether Uniloc defaulted—is not disputed. Both parties agree to the facts constituting an "Event of Default" as defined under the parties' agreements. As to the second part, recent discovery sweeps away the basis for Uniloc's argument that a cure had occurred, and confirms that there was no cure.[2] In the Related Cases, Uniloc argued, and the Court initially agreed, that Uniloc had cured any Event of Default. (-360 Dkt. No. 158 at 6–7.) This finding "relie[d] on the [James] Palmer declaration to find that plaintiffs had in fact cured the alleged events of default to Fortress's reasonable satisfaction." (*Id.* at 7.) The Palmer declaration was Uniloc's sole basis for asserting that a cure had occurred.

Mr. Palmer, however, has now ███████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

---

[1] Nos. 3:18-cv-00359, -360, -363, -365, and -572 (the "Related Cases"). For filings in the Related Cases, Apple cites to the -360 docket as representative of filings across the cases.

[2] The Court initially found, in related cases, that a cure had occurred. On reconsideration, the Court permitted Apple to take discovery on the issue and left open the "cure" question pending that discovery. (-360 Dkt. No. 204.)

**\*REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED\***

1 ███████████████████████████████████████████████████████████

2 ███████████████████████████████████████████

3 Other discovery makes clear why ████████████████████████████

4 ███████████████████████████████████████████████████████████

5 ███████████████████████████████████████████████████████████

6 ███████████████████████████████████████ Unsurprisingly, Uniloc

7 could not (and did not) produce a single document to support a cure. Quite the opposite: it admitted

8 that "no one" from "Uniloc or Fortress was contemporaneously discussing 'default,' 'waiver,' or

9 'cure.'" (Dkt. No. 139 at 5.) And, contrary to its prior argument to this Court that its default could

10 have and in fact had been "cured," Uniloc told Judge Connolly of the District of Delaware: "If the

11 money doesn't come in by a certain date, there's no way that that fact can be changed." (Ex. C,

12 10/1/20 Hearing Tr. 27:11–17, *Uniloc USA, Inc. and Uniloc Luxembourg, S.A. v. Motorola Mobility,*

13 *LLC*, No. 17-1658 (CFC) (D. Del.).) [3]

14      In short, discovery has now shown that, contrary to what Uniloc previously represented,

15 Uniloc never in fact cured any Event of Default. As a result, at the time Uniloc sued Apple, nonparty

16 Fortress held an unfettered right to license Apple to the patent-in-suit. That right deprived Uniloc of

17 constitutional standing. Apple's Motion should be granted, and the case dismissed.

18 **II.   FACTUAL BACKGROUND**

19      The factual background has been set forth in detail in prior briefing in the Related Cases. (*See*

20 -360 Dkt. No. 135.) Apple provides a brief overview of the facts relevant here.

21      **A.   Uniloc USA And Uniloc Lux Grant Fortress A License To All Their Patents,**
         **Including The Right To Sublicense Third Parties**

22

23      Since 2014, Uniloc USA and Uniloc Lux have operated as patent-enforcement entities.

24 Needing money to pay for their litigation campaigns, they approached Fortress. On December 30,

25 2014, Uniloc USA and Uniloc Lux entered into agreements with Fortress that memorialized a loan

26 ───────────────

27 [3] In *Uniloc USA, Inc. and Uniloc Luxembourg, S.A. v. Motorola Mobility, LLC*, No. 17-1658 (D. Del.), Motorola filed a motion to dismiss for lack of subject-matter jurisdiction based on the same underlying facts regarding Uniloc's default of its obligations to Fortress. That motion is fully briefed and Judge Connolly has held oral argument. However, Motorola's motion does not address the new

28 evidence regarding default and cure that is described in Apple's Motion here.

of money to the Uniloc entities. These agreements included: (1) a Conformed Revenue Sharing and Note and Warrant Purchase Agreement ("Revenue Sharing Agreement" or "RSA") (Ex. D); and (2) a Patent License Agreement ("Fortress License") (Ex. E). The RSA was later amended three times, with the final amendment occurring on May 15, 2017 ("Amendment" or "Third Amendment"). (Ex. F.)

As part of this financing arrangement, Uniloc USA and Uniloc Lux granted Fortress a broad patent license. (Ex. D, RSA § 2.8.) This license granted Fortress "the right to grant sublicenses[] with respect to the Patents" and applied to "all intellectual property of [Uniloc USA and Uniloc Lux]," including the patent-in-suit. (*Id.* § 2.8, Appendix I A-7; Ex. G, Levy 9/21/18 Dep. 66:22–67:5; Ex. H, Turner 10/8/18 Dep. 23:24–24:3.) The key language of the Fortress License provided:

> Subject to the terms and conditions herein and in the Purchase Agreement, Licensor hereby grants to Licensee a non-exclusive, transferrable*, sub-licensable*, divisible, irrevocable, fully paid-up, royalty-free, and worldwide license to the Licensed Patents, including, but not limited to, the rights to make, have made, market, use, sell, offer for sale, import, export and distribute the inventions disclosed in Licensed Patents and otherwise exploit the Licensed Patents in any lawful manner in *Licensee's sole and absolute discretion* solely for the benefit of the Secured Parties ("Patent License"), provided that *Licensee shall only use the Patent License following an Event of Default*.

(Ex. E, § 2.1 (emphasis added).) Fortress could thus grant licenses to Uniloc's patents in its "sole and absolute discretion" so long as the sublicense did not impose "financial obligations or restrictions" on Uniloc USA or Uniloc Lux. (*Id.* § 2.2.)

There was only one restriction on Fortress's sublicense rights. The Fortress License provided that "[Fortress] shall only use the Patent License following an Event of Default" (as defined in the RSA). (Ex. E, § 2.1.) The RSA in turn defined "Event[] of Default" broadly to include the failure of Uniloc USA or Uniloc Lux "to perform or observe any of the covenants or agreements contained in Article VI." (Ex. D, § 7.1.2.) Thus, "Fortress was given a license upfront," and its rights automatically vested upon an Event of Default. (Ex. C, -1658 10/1/20 Hearing Tr. 27:23–28:9 ("Once there's an event of default, they can use it.").) Unlike other remedies available to Fortress in an event of default, nothing in the RSA required Fortress to take any actions or steps before it could use its sublicensing rights under the Fortress License. (*See id.* at 32:22–33:16; *cf.* Ex. D, §§ 7.2.2, 7.2.3 (requiring "notice in writing" to Uniloc USA and Uniloc Lux before electing certain remedies).)

*REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED*

### B.   Uniloc Triggers An Event Of Default On March 31, 2017 And Never Cures It

On March 31, 2017—two months before Uniloc filed suit—an Event of Default occurred. Section 6.2.2 of the Revenue Sharing Agreement required Uniloc USA and Uniloc Lux to generate "at least $20,000,000 in Actual Monetization Revenues during the four fiscal quarter period ending on [March 31, 2017]." (Ex. D.) ████████████████

████████████████████████████████████████

███████████████████████████████ Because Uniloc USA and Uniloc Lux failed to satisfy the covenant of Section 6.2.2, an Event of Default existed as of March 31, 2017. (Ex. D, §§ 7.1, 7.1.2.)

█████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████████

On May 15, 2017, Uniloc and Fortress agreed to amend the RSA for a third time. (Ex. F.) By its express terms, the Amendment did not waive any Event of Default, nor did it change or remove the revenue requirement, or the consequences for failing to satisfy it. (*Id.*) Instead, the Amendment re-confirmed that all provisions of the RSA remained in full force and effect, including the revenue covenant, the definition of Event of Default, and Fortress's right to sublicense Uniloc's patents following an Event of Default. (*Id.*)

### III.   PROCEDURAL BACKGROUND

On May 26, 2017, Uniloc filed this action against Apple in the Eastern District of Texas. (Dkt. No. 1.) The case was transferred to this District upon Apple's motion, together with five other related cases: 3:18-cv-00359, -360, -363, -365, and -572.

/ / /

**\*REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED\***

Following transfer, Apple moved to dismiss this action on the grounds that the patent-in-suit claimed patent-ineligible subject matter. (Dkt. No. 53.) The Court granted Apple's motion on May 18, 2018, and entered judgment accordingly. (Dkt. Nos. 99, 100.) Uniloc appealed. (Dkt. No. 101.) While this case was on appeal, Apple obtained discovery from Uniloc in the Related Cases regarding the ownership of rights in the patents-in-suit. (-360 Dkt. No. 123.) It was only then that Apple learned the true division of rights in the patents-in-suit at the time of filing, as outlined in Section II above.

Apple filed a motion to dismiss on the grounds that Fortress's unfettered sublicensing right deprived Uniloc of the exclusionary rights needed for constitutional standing. (-360 Dkt. No. 135.) The Court initially denied Apple's motion because it found that Uniloc had "cured" any default prior to filing suit. (-360 Dkt. No. 158 at 6–7.) Apple moved for reconsideration and sought discovery as to whether a cure had, in fact, occurred. (-360 Dkt. No. 173.) Upon reconsideration, the Court permitted Apple to take this discovery. (-360 Dkt. No. 204 at 1–2.) Because the Related Cases were stayed, however, no discovery took place. (Dkt. No. 133.)

Because this case remained on appeal, Apple raised Uniloc's lack of standing with the Federal Circuit. The Federal Circuit remanded this case "for the purpose of supplementing the record with the documents pertaining to jurisdiction and resolving the presented jurisdictional issues in the first instance." (8/30/19 Opinion, Dkt. No. 58 at 8, *Uniloc USA, Inc. and Uniloc Luxembourg, S.A. v. Apple Inc.*, No. 2018-2094 (Fed. Cir.).) Following briefing from the parties, the Court ordered written discovery on the issues of default and cure, among others. (Dkt. No. 133 at 2.) Discovery proceeded in accordance with the Court's Order. In addition, the parties conducted relevant deposition discovery in connection with other cases between them. With discovery now complete, Apple files this Motion based on the new evidence that conclusively establishes that Uniloc's default was never cured and that therefore Uniloc lacked Article III standing at the time this case was filed.

## IV.  LEGAL STANDARDS

Apple's Motion relies on evidence outside of the pleadings and thus presents a "factual attack" on subject-matter jurisdiction. *See Leite v. Crane Co.*, 749 F.3d 1117, 1121 (9th Cir. 2014). "When the defendant raises a factual attack, the plaintiff must support her jurisdictional allegations with 'competent proof[]' . . . under the same evidentiary standard that governs in the summary judgment

context. The plaintiff bears the burden of proving by a preponderance of the evidence that each of the requirements for subject-matter jurisdiction has been met." *Id.* (internal citations omitted); *Sicom Sys., Ltd. v. Agilent Techs., Inc.*, 427 F.3d 971, 976 (Fed. Cir. 2005) ("The party bringing the action bears the burden of establishing that it has standing.") (citation omitted).

To establish subject-matter jurisdiction in a patent infringement action, a patent plaintiff must establish that it holds the right to exclude the accused infringer from practicing the claimed invention. *Luminara Worldwide, LLC v. Liown Elecs. Co.*, 814 F.3d 1343, 1348 (Fed. Cir. 2016). If an accused infringer "has the ability to obtain . . . a license from another party with the right to grant it," then the putative plaintiff "does not have an exclusionary right with respect to the alleged infringer and thus is not injured by that alleged infringer." *WiAV Sols. v. Motorola, Inc.*, 631 F.3d 1257, 1266 (Fed. Cir. 2010); *Tech. Props. Ltd. LLC v. Canon Inc.*, No. C 14-3640 CW, 2016 WL 4447142, at *2 (N.D. Cal. Aug. 24, 2016) ("[T]he exclusive licensee must be the only party from whom the defendant could potentially obtain a license.") (citation omitted). This rule applies to patent owners as well as licensees. *Morrow v. Microsoft Corp.*, 499 F.3d 1332, 1340–41 (Fed. Cir. 2007)*; see Azure Networks, LLC v. CSR PLC*, 771 F.3d 1336, 1344 (Fed. Cir. 2014) ("[A] nonexclusive . . . licensee does not have a legally protected interest conferred by the Patent Act. That same logic applies even if it is the patent owner holding the nonexclusive right . . . .") (internal citation omitted), *vacated on other grounds*, 135 S. Ct. 1846 (2015). If the plaintiff fails to show that it possessed Article III standing at the time of filing, the suit must be dismissed. *Sicom*, 427 F.3d at 976.

## V.   UNILOC TRIGGERED AN EVENT OF DEFAULT AND NEVER CURED IT

The subject-matter jurisdiction issue boils down to two questions: (1) did Uniloc trigger an Event of Default under express terms of the RSA? and (2) did Uniloc cure or otherwise annul that Event of Default? If Uniloc triggered an Event of Default and failed to cure it before filing suit, Fortress held an unfettered right to license the patent-in-suit to any entity, including Apple. The unambiguous terms of the RSA and new facts uncovered in discovery establish that this is precisely what happened.

/ / /

/ / /

**\*REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED\***

**A.     Uniloc Triggered An Event Of Default Under The Express Terms Of The RSA**

As to the Event of Default, the material facts are not in dispute. Between April 1, 2016, and March 31, 2017, Uniloc generated only ████████ in patent monetization revenue. ██████████ ████████████████████████████████████████████████████████████ ████████    The express and unambiguous terms of the RSA, however, required Uniloc to generate $20 million in revenue over this four-quarter period. (Ex. D, § 6.2.2.) The RSA explicitly defined the failure to generate this revenue as an "Event of Default." (*Id.* § 7.1.2.) Thus, Uniloc's failure to generate the revenue required by Section 6.2.2 of the RSA constituted an "Event of Default," by definition, under the RSA.

Uniloc does not and cannot contest any of these facts. Nor does it claim that the RSA is ambiguous in any way. Instead, Uniloc has attempted to evade the express terms of the RSA by pointing to hindsight testimony about what the parties believed in the form of the Palmer Declaration, or else arguing that Fortress took no action to establish an event of default and thus none existed. Uniloc's arguments contradict the RSA and should be rejected.

1)     Parol Evidence Cannot Rewrite The Unambiguous Term "Event of Default"

Relying on the Palmer Declaration, Uniloc has suggested that, contrary to the definition of "Event of Default" in the RSA, the parties did not intend for Uniloc's failure to generate the minimum revenue required by Section 6.2.2 to trigger an Event of Default. (*See* Ex. J, ¶ 10 (describing the revenue minimums as "no longer of significance").) Uniloc's attempt to rewrite the RSA in this way should be rejected.

As an initial matter, the Palmer Declaration is parol evidence and cannot be used to argue that the parties' intent differed from the intent manifested by their unambiguous contract. The RSA contains a merger clause that bars the use of such evidence: "This Agreement and the Documents constitute the entire understanding of the parties with respect to the subject matter hereof and thereof . . . ." (Ex. D, § 9.9.) And under New York law, which governs the RSA, such a merger clause "bar[s] the introduction of extrinsic evidence to alter, vary or contradict the terms of [a contractual] writing . . . ." *Jarecki v. Shung Moo Louie*, 745 N.E.2d 1006, 1009 (Ct. App. N.Y. 2001) (citation omitted). The RSA unambiguously defines the failure "to perform or observe any of the covenants or

**\*REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED\***

agreements contained in Article VI," which includes Section 6.2.2, as an Event of Default. (Ex. D, §§ 7.1, 7.1.2 ("Each of the following events is referred to as an 'Event of Default'").) Thus, the Palmer Declaration cannot be used to contradict the RSA's explicit definition of Event of Default. *See Immunex Corp. v. Sandoz Inc.*, 964 F.3d 1049, 1060 (Fed. Cir. 2020) (rejecting reliance on testimony when interpreting parties' intent from unambiguous contract).

Mr. Palmer's statements that Fortress did not know or believe Uniloc to be in default are similarly inadmissible as parol evidence. They are also irrelevant. (Ex. J, ¶ 11.) The RSA deemed an Event of Default to exist based on the occurrence of certain events and contained no terms requiring Fortress to know or believe that an Event of Default had occurred. (Ex. D, § 7.1.) "As a sophisticated [lender] who negotiated the Agreement with counsel, [Fortress] had to look no further than to the plain language of the Agreement to know that an Event of Default had occurred . . . ." *Gaia House Mezz LLC v. State St. Bank & Tr. Co.*, 720 F.3d 84, 92 (2d Cir. 2013). Further, the RSA recognizes that Events of Default exist prior to, and separately from, the parties' knowledge of such events. (*See id.* § 6.5.1.2 (requiring Uniloc to notify Fortress "promptly upon acquiring knowledge" that an Event of Default existed).) It is thus the RSA that defines whether an Event of Default has occurred, not Fortress's subjective beliefs or feelings.

    2) <u>The Drafting History Of The RSA Confirms That Uniloc Caused An Event Of Default</u>

Even if Mr. Palmer's testimony on the existence of a default were not improper parol evidence, it should still be disregarded as contrary to the drafting history of the RSA. Mr. Palmer testified that ████████████████████████████████████████████████ ████████████████████████████████████████████████ ██████████████████████████████ But Mr. Palmer admits ██████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ██████████████████████████████████ ████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████

**\*REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED\***



21     3)  <u>Fortress's Failure To Act On Its Rights Does Not Negate The Event Of Default</u>

22     During his deposition, Mr. Palmer offered

23

24                          Uniloc appears to have adopted this theory in other litigation regarding this

25     issue. For example, in *Uniloc USA v. Motorola Mobility*, Uniloc argued to Judge Connolly of the

26     District of Delaware that Fortress did not take any "procedural steps to implement an event of default"

27     and thus no event of default occurred. (Ex. C, -1658 10/1/20 Hearing Tr. 27:18–22.) Uniloc's latest

28     argument, like its previous ones, contradicts the express terms of the RSA and should be rejected.

**\*REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED\***

1   The RSA is clear. Under Section 7.1 and 7.1.2, the "fail[ure] to perform" under Section 6.2.2

2   "is referred to as an 'Event of Default'" by definition. (Ex. D.) The Fortress License permits Fortress

3   to sublicense the patent-in-suit in its sole and absolute discretion following "an Event of Default."

4   (*Id.* § 2.8; Ex. E, Fortress License § 2.1.) Nowhere does the RSA spell out any "procedural steps"

5   that require Fortress to "put" Uniloc in default. Instead, Fortress's unfettered sublicensing right vests

6   automatically by operation of law once a defined "Event of Default" occurs.

7   Uniloc has appeared to concede that no "procedural steps" were required in order for an event

8   of default to occur. At oral argument before Judge Connolly, Uniloc admitted that Fortress had the

9   right and power to grant sublicenses immediately upon occurrence of an event of default. (Ex. C, -

10  1658 10/1/20 Hearing Tr. 28:5–8 ("THE COURT: Okay. So that means once there's an event of

11  default, they can use the license. Right? MR. FOSTER: Once there's an event of default, they can

12  use it.").) And Judge Connolly likewise indicated that this was the proper interpretation of the RSA:

13  "Section 2.8 is pretty clear on that it seems. They had the license. . . . And then all it says is, they

14  don't use it following an event of default. That means if there's an event of default, once it occurs,

15  they can use it." (*Id.* at 33:7–16.)

16  The remainder of the RSA confirms that Fortress need not take any action for an "Event of

17  Default" to occur and its unfettered sublicensing rights to vest. Other remedies following an Event of

18  Default, such as acceleration of the outstanding loan balance, required Fortress to provide "notice in

19  writing" in order to elect them. (Ex. D, RSA § 7.2.2.) But no such election is required for Fortress's

20  sublicensing right. Likewise, the RSA states that Fortress's "delay or omission" in exercising its rights

21  cannot be used to show it has waived those rights. (*Id.* § 9.4.2; *see also id.* § 7.4.2 (Uniloc agreeing

22  to waive "any requirement of diligence or promptness on the part of [Fortress] in the enforcement of

23  its rights under this Agreement.").) This again shows that Fortress's failure to do something upon

24  occurrence of a default cannot be used to negate the existence of that default. Fortress specifically

25  bargained for a sublicensing right that vested automatically upon occurrence of an Event of Default,

26  and it bargained for language that would ensure that its silence could not be used to waive or nullify

27  those rights. Fortress may now regret having structured its rights in this way, but it cannot disavow

28  the unambiguous terms it asked for.

**\*REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED\***

At bottom, Uniloc failed to generate $20 million between April 1, 2016, and March 31, 2017, as required by the express terms of the RSA. Thus, Uniloc triggered an Event of Default on March 31, 2017, and no amount of extrinsic evidence or hindsight testimony can change that fact.

**B.      Uniloc Never Cured Or Otherwise Annulled Any Event Of Default**

Because an Event of Default occurred as of March 31, 2017, it was "deemed to exist and be continuing for all purposes of this Agreement until" certain events took place. (Ex. D, RSA § 7.3.) Under the terms of the RSA, only three events could remove an Event of Default from existence:

1.      Fortress "waive[s] such Event of Default in writing." (*Id*. § 7.3(x).)

2.      The parties agree to an amendment to the RSA "which by its express terms cures such Event of Default." (*Id*. § 7.3(z).)

3.      Uniloc "cure[s] [the] Event of Default to [Fortress's] reasonable satisfaction." (*See* Dkt. No. 139 at 4; Ex. D, RSA § 7.3(y).)

It is undisputed that the first two scenarios did not occur. Fortress never waived any default in writing, and Uniloc has never offered any evidence that it did so. (*See* Dkt. No. 139 at 4; ███████████ ██████████.) Nor is there any provision in the May 15, 2017 amendment to the RSA that cures any Event of Default "by its express terms," and Uniloc has not and cannot argue otherwise. ████ ████████████████████████

Instead, Uniloc focuses all of its arguments on the third possibility: a "cure." At the time the Court addressed the "cure" issue in the Related Cases, the only evidence of record was the declaration of James Palmer. (Ex. J.) The Court expressly stated that it relied on that declaration to find that a cure occurred. (-360 Dkt. No. 158 at 7.) Now, however, new evidence uncovered in subsequent discovery establishes that no cure in fact occurred.

1)   <u>New Evidence Proves No Cure Occurred Or Could Have Occurred</u>

The first and most important piece of new evidence that no cure occurred comes from Mr. Palmer's deposition testimony. Contrary to his prior declaration, Mr. Palmer now admits ████ ████████████ █████████████████████████████████████████████████ ████████████████████████████ ████████████████████████

**\*REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED\***

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

████████████████████████████████████████ But "[c]uring a default commonly means taking care of the triggering event and returning to pre-default conditions." *In re Taddeo*, 685 F.2d 24, 26–27 (2d Cir. 1982); *see also Bank of New York Mellon Trust Co., Nat'l Ass'n v. Solstice ABS CBO II, Ltd.*, 910 F. Supp. 2d 629, 649 (S.D.N.Y 2012). "Dictionaries agree that curing connotes correction, elimination, or rectification." *SEE, Inc. v. See Concept SAS*, No. 16-13261, 2017 WL 768616, at \*4 (E.D. Mich. Feb. 28, 2017) (citing *Merriam-Webster's Collegiate Dictionary* 284 (10th ed. 1999) ("to deal with in a way that eliminates or rectifies"); *The American Heritage Dictionary* 323 (11th ed. 2003) ("to get rid of" or "to remedy")). ████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████ The prior finding that a "cure" exists relied on testimony that has since been contradicted, disavowed, and discredited, and should now be thrown out.

The second piece of new evidence that no cure occurred comes from Uniloc's admissions that it took no action regarding its event of default and thus could not have "cured" it. The RSA gives no special meaning to the word "cure" and thus its commonly understood meaning governs. To "cure" any Event of Default, Uniloc would need to "tak[e] care of the triggering event" or "correct[], eliminat[e], or rectif[y]" that event. *Taddeo*, 685 F. 2d at 26–27; *SEE*, 2017 WL 768616 at \*4. Here, Uniloc did nothing at all to rectify, correct, or eliminate the Event of Default caused by its revenue shortfall. (Ex. B, Turner 10/1/20 Dep. 87:22–88:1.) It made no attempt to "make up" for the shortfall. In fact, ████████████████████████████████████████████████████████████

**\*REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED\***

1  ████████████████████████████████████████████████████████ *Cf. Bakalis v.*

2  *Bakalis*, 88 N.Y.S.3d 899, 900 (N.Y. App. Div. 2018) ("[T]he defendant . . . cured his default in

3  payment . . . by making the required payment . . . on the cure date fixed by the plaintiff."). Tellingly,

4  Uniloc produced no documents or evidence showing what actions it took to cure, when it took them,

5  and how it effected a cure of its revenue shortfall. (*See id*. at 214:7–9 (refusing to provide a date on

6  which Uniloc cured any Event of Default).) This confirms that, as Uniloc admitted, "no one" at

7  Fortress or Uniloc was even discussing a waiver, cure, or default, or "wiping the slate clean"—much

8  less doing anything to effect one. (Dkt. No. 139 at 5.) By Uniloc's own admission and failure to

9  produce documents, then, Uniloc never cured any Event of Default.

10  Uniloc previously argued that, so long as Fortress was reasonably satisfied with Uniloc

11  overall, any Event of Default would be "cured." But this argument misinterprets Section 7.3(y) of the

12  RSA. Under this section, Fortress's "reasonable satisfaction" must be with Uniloc's efforts to "cure,"

13  not with Uniloc's performance generally. (Ex. D, § 7.3(y).) In fact, Judge Connolly identified this

14  same problem with Uniloc's argument. (Ex. C, -1658 10/1/20 Hearing Tr. 26:12–16 ("But still,

15  you've got to cure it. I mean, we'll deal with that to their reasonable satisfaction. Let's deal first with

16  the, you've got to cure it. So how do you cure something by not doing anything?").) By its own terms,

17  Section 7.3(y) contemplates that there must first be a cure before Fortress can express reasonable

18  satisfaction with it. (*See id*. at 25:22–23 ("THE COURT: How do you cure a default by not doing

19  anything?").) Because Uniloc took no action at all to rectify its Event of Default, there was nothing

20  for Fortress to have "satisfaction" with, and nothing for the Court to analyze to determine whether

21  that satisfaction was "reasonable."

22  Moreover, Uniloc's interpretation of Section 7.3(y) strips it of all meaning. According to

23  Uniloc, "cured to Fortress's reasonable satisfaction" can also mean "***defaulted*** to Fortress's

24  reasonable satisfaction" or "***not cured***, but to Fortress's reasonable satisfaction." This makes no

25  sense—Section 7.3(y) cannot be read to include both its plain meaning and the opposite of that

26  meaning. Further, Section 7.3 already set forth the two ways that Fortress could annul an Event of

27  Default where Fortress is satisfied but Uniloc has not done, or cannot do, anything to rectify or

28  eliminate that default: (1) execute a written waiver under Section 7.3(x), or (2) effect a cure by

**\*REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED\***

1    amendment under Section 7.3(z). But Fortress did not avail itself of these two options. Uniloc cannot

2    now seek to rewrite the unambiguous language of the third one.

3         Uniloc's argument that Fortress's "reasonable satisfaction" alone is a cure, even without any

4    effort to cure or rectify the default, also contradicts the RSA's prohibition on implied waivers. (Ex. D,

5    § 9.4.2.) When Uniloc argues that the Event of Default should not be deemed to exist because Fortress

6    was satisfied and the parties continued with business as usual, it is arguing for an implied waiver

7    based on a course of dealing. The RSA, however, explicitly forbids the use of a course of dealing to

8    effect an implied waiver. (*Id.*) Uniloc cannot vitiate Section 9.4.2 by repackaging its course of dealing

9    argument as a "cure" argument.

10        Finally, the third piece of new evidence that Uniloc's default was not cured is its concession

11   that the Event of Default triggered by its revenue shortfall ***could not be cured***. Uniloc told Judge

12   Connolly that its default was incurable: "If the money doesn't come in by a certain date, there's no

13   way that that fact can be changed." (Ex. C, -1658 10/1/20 Hearing Tr. 27:11–17, 28:16–29:6 (noting

14   that some defaults by their nature may not be curable where an obligation "has to be met by [a] certain

15   date and that date passes and it hasn't been met," and thus instead require waiver or other annulment).)

16   Uniloc's concession comports with the language of the RSA. The RSA provides no cure period for

17   any Events of Default. (Ex. D, § 7.3.) Nor does it provide any indication as to how Uniloc could have

18   cured its failure to generate $20 million in revenue by March 31, 2017, after that deadline has passed.

19   Because Uniloc itself concedes that it could not have cured the Event of Default caused by its revenue

20   shortfall on March 31, 2017, the Court should now find that no cure occurred.

    2)   Fortress's Execution Of The Third Amendment Does Not Constitute A Cure

22        Apart from the Palmer Declaration, the only other evidence Uniloc has used to support a

23   "cure" is the act of executing the Third Amendment to the RSA on May 15, 2017. (Ex. J, Palmer

24   Decl. ¶¶ 10, 12.) But the execution of this amendment does not and cannot provide evidence of a

25   cure.

26        ***First***, the execution of the Third Amendment cannot be found to cure an Event of Default

27   because such a finding would contradict the RSA. Under the RSA, an amendment can cure an Event

28   of Default only if it "by its express terms cures such Event of Default." (Ex. D, § 7.3(z).) The Third

**\*REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED\***

1   Amendment does not do so. Section 7.3(z) would be rendered meaningless if an amendment which

2   does **not** cure an Event of Default by its express terms can still cure an Event of Default. *See Bank of*

3   *New York Mellon*, 910 F. Supp. 2d at 648–49 ("[A] contract should be construed so as to give full

4   meaning and effect to all of its provisions.") (citation and internal quotation marks omitted).

5        ***Second***, the Third Amendment not only omits express language of cure, it contains express

6   language disavowing any waiver or relinquishment of rights, stating: "The execution, delivery and

7   effectiveness of this Amendment shall not operate as a waiver of any right, power or remedy . . . nor

8   constitute a waiver of any provision of the Agreement or any Document." (Ex. F, § 4.) This language

9   expresses a clear intent that the execution of the Amendment is not to be used as a basis to conclude

10  that Fortress has relinquished any of its rights.

11       ***Third***, Fortress's decision to lend additional money to Uniloc by means of the Third

12  Amendment is not evidence of a cure because it was in Fortress's financial interest to continue lending

13  money to Uniloc despite the Event of Default. ████████████████████████████

14  ████████████████████████████████████████████████████

15  ████████████████████████████████████████████████████

16  ████████████████████████████████████████████████████

17  ████████████████████████████████████████████████████

18  ████████████████████████████████████████████████████

19  ████████████████████████████████████████████████████

20  ████████████████████████████████████████████████████

21  ████████████████████████████████

22       The record before the Court now is completely different than the one before the Court in the

23  Related Cases two years ago. The current record not only establishes that the Event of Default was

24  never cured as a matter of fact, but that it could not have been cured as a matter of law. The Court

25  should now find that Uniloc did trigger an Event of Default and never cured it.

26  **VI.   FORTRESS'S UNFETTERED SUBLICENSING RIGHT DEPRIVED UNILOC OF STANDING TO SUE**

27       Because Uniloc triggered an event of default and failed to cure it, Fortress was automatically

28  vested with the right to grant sublicenses in its "sole and absolute discretion." (Ex. E, Fortress License

§ 2.1.) Fortress possessed that right at the time Uniloc acquired the patent-in-suit on May 26, 2017, and its rights automatically attached upon Uniloc's acquisition of that patent. (*See* Ex. G, Levy 9/21/19 Dep. 66:22–67:5, 71:21–72:1.) As a result, Fortress held the right to sublicense the patent-in-suit to Apple at the time Uniloc filed suit. Fortress's possession of this right is fatal to Uniloc's constitutional standing at the time of filing.

If an accused infringer "has the ability to obtain . . . a license from another party with the right to grant it," then the putative plaintiff "does not have an exclusionary right with respect to the alleged infringer and thus is not injured by that alleged infringer." *WiAV Solutions*, 631 F.3d at 1266. Here, neither Uniloc Lux nor Uniloc USA had the right to exclude Apple from practicing the patent-in-suit. Fortress, in its sole and absolute discretion, held the right to license Apple at any time, and neither Uniloc Lux nor Uniloc USA had any ability to prevent Fortress from exercising that right. Because Fortress had the right to sublicense Apple to the patent-in-suit, both Uniloc plaintiffs lacked constitutional standing to sue. *See Luminara Worldwide*, 814 F.3d at 1348 ("If [the patentee] could . . . license any entity . . . , [the licensee] would not have had exclusionary rights to the asserted patents."); *Acceleration Bay LLC v. Activision Blizzard, Inc.*, No. CV 16-453-RGA, 2017 WL 3668597, at *3 (D. Del. Aug. 24, 2017) (third party's ability to license the accused infringers deprived plaintiff of standing to sue).

The fact that Uniloc Lux purported to grant Uniloc USA an "exclusive licensee" does not change the result. As of May 26, 2017, Fortress already possessed the right to grant sublicenses to any patents owned by Uniloc Lux because the Event of Default had already occurred. Thus, as of May 26, 2017, Uniloc Lux did not itself possess an exclusive right to license the patent-in-suit because Fortress could license any entity it so chose and Uniloc Lux could not stop it from doing so. Because "an owner or licensee of a patent cannot convey that which it does not possess," *Prima Tek II, L.L.C. v. A-Roo Co.*, 222 F.3d 1372, 1382 (Fed. Cir. 2000) (citation omitted), Uniloc Lux could not convey exclusive rights to Uniloc USA. In other words, Uniloc Lux could not grant Uniloc USA "exclusive" rights in the patent-in-suit because Uniloc Lux itself could not "promise that others shall be excluded from practicing the invention within [the relevant] territory," *Rite-Hite Corp. v. Kelly Co., Inc.*, 56 F.3d 1538, 1552 (Fed. Cir. 1995) (citation omitted).

**\*REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED\***

As a result of the Fortress License and Uniloc Lux's license to Uniloc USA, the division of rights in the patent-in-suit at the time this case was as filed was as follows:

| Entity | Rights Held | Rights Not Held |
|--------|-------------|-----------------|
| Uniloc Lux | Legal title only | No right to practice or sublicense<br><br>No right to exclude others from practicing or prevent Uniloc USA or Fortress from sublicensing |
| Uniloc USA | Non-exclusive right to practice and sublicense | No right to exclude others due to Fortress's sublicensing right |
| Fortress | Non-exclusive right to practice and sublicense | No right to exclude others from practicing invention |

Neither Uniloc Lux nor Uniloc USA held the exclusionary rights necessary for Article III standing at the time of filing, and thus the Court must dismiss for lack of subject-matter jurisdiction.

In its Renewed Motion, Uniloc relies extensively on the Federal Circuit's decision in *Lone Star Silicon Innovations LLC v. Nanya Technology Corp.*, to argue that it possessed the exclusionary rights necessary to file suit. 925 F.3d 1225 (Fed. Cir. 2019). (Dkt. No. 158 at 4–6.) As explained in Apple's Opposition to Uniloc's Renewed Motion, the holding in *Lone Star* that Uniloc cites is inapposite because the present case presents an issue of constitutional standing, as distinct from the "statutory" standing issue raised in *Lone Star*. (Dkt. No. 163 at 1.) In fact, to the extent *Lone Star* does discuss constitutional standing, it re-affirms the principle that a third party's unfettered right to sublicense an accused infringer can deprive a patent plaintiff of constitutional standing. In *Lone Star*, third party AMD had the right, in its sole discretion, to grant sublicenses to so-called "unlisted entities." 925. F.3d at 1231–32 ("[I]t is AMD who decides whether Lone Star can challenge or indulge infringement with respect to *unlisted* targets."). Thus, as to "unlisted" entities, the Federal Circuit determined that Lone Star's right to sue was "illusory" because "AMD can grant a sublicense and negate the lawsuit." *Id.* (citing *Speedplay, Inc. v. Bebop, Inc.*, 211 F.3d 1245, 1251 (Fed. Cir. 2000)). Critically, however, the defendants in *Lone Star* were not "unlisted entities" who could obtain a license from AMD. *Id.* Because AMD could not license these defendants, Lone Star possessed the necessary exclusionary rights to establish Article III standing to sue as to those entities. *Id.* at 1234 (citing *WiAV* for the proposition that a party "may have standing to sue some parties and not others.").

/ / /

1   Like AMD in *Lone Star*, Fortress is the one "who decides whether [Uniloc] can challenge or

2   indulge infringement" because it held the right to license any entity it wants and thereby render

3   Uniloc's right to sue "illusory." *Id.* at. 1231–32. But unlike AMD's sublicensing right, which was

4   limited to "unlisted" entities and did not extend to the defendants, Fortress's sublicensing right is not

5   so limited and extends to Apple. Thus, Apple is in the same position as the "unlisted entities" who

6   the *Lone Star* plaintiff lacked the right to exclude. *Id*. *Lone Star* thus confirms that Apple's Motion

7   should be granted and the case dismissed.

8   **VII.   UNILOC'S LACK OF CONSTITUTIONAL STANDING REQUIRES DISMISSAL**

9   The Federal Circuit has warned parties about the potential standing consequences of dividing

10  up patent rights: "While parties are free to assign some or all patent rights as they see fit based on

11  their interests and objectives, this does not mean that the chosen method of division will satisfy

12  standing requirements." *Morrow*, 499 F.3d at 1341 n.8. Following *Morrow*, courts have recognized

13  that it is possible for a licensor and licensee to agree on a "contractual division of patent rights [that]

14  may have the effect of defeating standing as to all relevant parties." *Fairchild Semiconductor Corp.*

15  *v. Power Integrations, Inc.*, 630 F. Supp. 2d 365, 372–73 (D. Del. 2007); *see also Luminara*, 814

16  F.3d at 1348 ("If Disney Enterprises could indeed license any entity to manufacture and sell candles

17  having Artificial Flame Technology, Candella would not have had exclusionary rights to the asserted

18  patents."). Here, Uniloc and Fortress are sophisticated entities who intentionally granted an unfettered

19  sublicensing right to Fortress as a condition for financing. They may not have appreciated the full

20  legal ramifications of that choice, and may now regret their decision in hindsight. But buyers' remorse

21  is not (and has never been) a basis to rewrite an unambiguous contract and thereby disregard

22  constitutional standing requirements.

23  Instead, the consequences flowing from Uniloc's and Fortress's chosen division of rights fall

24  on the parties in the best position to fix it: Uniloc and Fortress. If, as Uniloc claims, Fortress were so

25  pleased that it would have been willing to waive Uniloc's default in writing, as the RSA requires, it

26  would have been a simple matter for Uniloc to have sought and obtained such a waiver before filing

27  suit. (*See* Ex. D, § 7.3(x).) Or, if the revenue requirement were truly "no longer of significance" (Ex.

28  J, Palmer Decl. ¶ 10), Uniloc and Fortress could easily have amended the RSA to remove Section 6.2

**\*REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED\***

1   and cure any past defaults by express written amendment before filing suit (*Id.* § 7.3(z)). Or, if they

2   failed to take these steps before filing, they could have dismissed this suit, taken the steps needed to

3   fix their division of rights, and re-filed. *See Paradise Creations, Inc. v. UV Sales, Inc.*, 315 F.3d 1304,

4   1310 (Fed. Cir. 2003). Or they could have avoided this problem from the outset by restricting

5   Fortress's sublicensing rights such that it could not license Apple, or requiring Fortress to take some

6   affirmative step before its unfettered sublicensing right would vest, similar to how other remedies in

7   the Event of Default required Fortress to provide written notice first. (*Cf.* Ex. D, RSA §§ 7.2.2, 7.2.3.)

8       Uniloc and Fortress took none of these steps, and only have themselves to blame for their

9   predicament. *See Gaia House*, 720 F.3d at 94 ("The 'contracted-for financial consequence of [the

10  parties'] own failure to do that which [they] promised to do' is not a forfeiture.") (citations omitted).

11  Because Uniloc lacked the right to exclude Apple from practicing the patent-in-suit when it filed this

12  case, it lacked Article III standing to bring this suit. The case should now be dismissed for lack of

13  constitutional standing.

14

15  DATED:  October 22, 2020                Respectfully submitted,

16                                          */s/ Doug Winnard*
                                            Michael T. Pieja (CA Bar No. 250351)

17                                          Alan E. Littmann (*pro hac vice*)
                                            Jennifer Greenblatt (*pro hac vice*)

18                                          Doug Winnard (CA Bar No. 275420)
                                            Andrew J. Rima (*pro hac vice*)

19                                          Emma C. Ross (*pro hac vice*)
                                            Lauren Abendshien (*pro hac vice*)

20                                          GOLDMAN ISMAIL TOMASELLI
                                            BRENNAN & BAUM LLP

21                                          200 South Wacker Dr., 22nd Floor
                                            Chicago, IL 60606

22                                          Tel: (312) 681-6000
                                            Fax: (312) 881-5191

23                                          mpieja@goldmanismail.com
                                            alittmann@goldmanismail.com

24                                          jgreenblatt@goldmanismail.com
                                            dwinnard@goldmanismail.com

25                                          arima@goldmanismail.com
                                            eross@goldmanismail.com

26                                          labendshien@goldmanismail.com

27                                          Kenneth Baum (CA Bar No. 250719)

28                                          GOLDMAN ISMAIL TOMASELLI
                                            BRENNAN & BAUM LLP

**\*REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED\***

429 Santa Monica Boulevard, Suite 710
Santa Monica, CA 90401
Tel: (310) 576-6900
Fax: (310) 382-9974
kbaum@goldmanismail.com

*Attorneys for Defendant Apple Inc.*

*REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED*

1

<u>**PROOF OF SERVICE**</u>

2   The undersigned hereby certifies that a true and correct copy of **DEFENDANT APPLE**

3 **INC.'S MOTION TO DISMISS FOR LACK OF SUBJECT-MATTER JURISDICTION** has

4 been served on October 22, 2020, to all counsel of record who are deemed to have consented to

5 electronic service.

6

7

8   */s/ Doug Winnard*
Doug Winnard (CA Bar No. 275420)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28