# EXHIBIT M

UNITED STATES
SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

# FORM 8-K

CURRENT REPORT

Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934

Date of report (Date of earliest event reported): February 13, 2014

## Document Security Systems, Inc.

(Exact Name of Registrant as Specified in Charter)

| New York | 001-32146 | 16-1229730 |
|---|---|---|
| (State or Other Jurisdiction of Incorporation) | (Commission File Number) | (IRS Employer Identification No.) |

| First Federal Plaza, Suite 1525 28 E. Main Street Rochester, NY | 14614 |
|---|---|
| (Address of Principal Executive Offices) | (Zip Code) |

Registrant's telephone number, including area code: (585) 325-3610

(Former name or former address, if changed since last report)

Copies to:
Gregory Sichenzia, Esq.
Sichenzia Ross Friedman Ference LLP
61 Broadway, 32nd Floor
New York, New York 10006
Phone: (212) 930-9700
Fax: (212) 930-9725

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions:

☐   Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐   Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐   Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐   Pre-commencement communications pursuant to Rule 13e-4 (c) under the Exchange Act (17 CFR 240.13e-4(c)

**Item 1.01 Entry into a Material Definitive Agreement**

On February 13, 2014 (the "Effective Date"), DSS Technology Management, Inc. (the "Company"), Document Security Systems, Inc. ("DSS"), Fortress Credit Co LLC, as collateral agent (the "Collateral Agent"), and certain investors (the "Investors") entered into an Investment Agreement (the "Agreement") pursuant to which the Company contracted to receive a series of advances (collectively, the "Advances") from the Investors, as described below. DSS, as parent of the Company, is a party to the Agreement only for purposes of Section 8.2.2 thereof.

On the Effective Date, the Company issued and sold a promissory note in the amount of $1,791,000 (the "Initial Advance Note"), fixed return equity interests in the amount of $199,000 (the "Initial Fixed Return Interests"), and contingent equity interests in the amount of $10,000 (the "Contingent Interests"), to each the Investors, and in return received $2,000,000 in proceeds (collectively, the "Initial Advance"), to be utilized by the Company to meet its working capital and intellectual property monetization funding needs.

Upon the Company achieving the First Milestone as defined in the Agreement, the Company will issue and sell to the Investors a promissory note in the amount of $900,000 (the "First Milestone Note") and fixed return equity interests in the amount of $100,000 (the "First Milestone Fixed Return Interests"), and in turn will receive $1,000,000 (collectively, the "First Milestone Advance").

Upon the Company achieving the Second Milestone as defined in the Agreement, the Company will issue and sell to the Investors a promissory note in the amount of $1,350,000 (the "Second Milestone Note") and fixed return equity interests in the amount of $150,000 (the "Second Milestone Fixed Return Interests"), and in turn will receive $1,500,000 (collectively, the "Second Milestone Advance").

The Initial Advance Note, the First Milestone Note, and the Second Milestone Note (collectively, the "Notes") shall bear interest at a rate per annum equal to the Applicable Federal Rate on the unpaid principal amount thereof. The Notes will also be subject to a Make Whole Amount calculation (as defined in the Agreement), which will result in an effective annual interest rate of approximately 4.23% for the term thereof, assuming no prepayments. At the Company's option, it may pay accrued interest when due on the Notes, or elect to capitalize the accrued interest, adding it to the principal thereof. The maturity date of all the Notes shall be the date four years after issuance of the Initial Advance Notes.

The Company will apply any proceeds it receives in connection with the monetization of certain Patents (as defined in the Agreement) to the payment of the Notes, the Fixed Return Interests, and the Contingent Interests, in the following order (the "Payment Waterfall"): (i) 100% of the first $5,000,000 of Gross Receipts (as defined in the Agreement) shall be paid to the purchasers of the Notes, until they have received payment in full thereunder (including any Make Whole Amount), then to the Fixed Return Interest purchasers until they have received their Fixed Return (as defined in the Agreement), and then to the Contingent Interest purchasers until they have received their 2(x) Return (as defined in the Agreement); then (ii) 100% of the next $3,300,000 of Gross Receipts may be retained by the Company or paid to the Company's counsel; then (iii) the Applicable Percentage (as defined in the Agreement) of any Gross Receipts following the application of the first $8,300,000 shall be paid to the Notes purchasers until they have received payment in full thereunder, then to the Fixed Return Interests purchasers until they have received their Fixed Return, and then to the Contingent Interests purchasers until they have received their 2(x) Return; then (iv) after full payment of the Notes and Fixed Interests have been made, the Company shall pay the Contingent Interest purchasers 12% of the Gross Receipts and the Company shall be entitled to 88% of the Gross Receipts.

Pursuant to the Agreement, the Company granted, to the Collateral Agent, for the benefit of the Secured Parties (as defined in the Agreement), a non-exclusive, royalty-free, license (including the right to grant sublicenses subject to certain restrictions as further described in the Agreement and Patent License) with respect to the Patents (as defined in the Agreement), which shall be governed by the Patent License.

# INVESTMENT AGREEMENT

This INVESTMENT AGREEMENT (this " Agreement ") is dated as of February 13, 2014 by and among DSS Technology Management, Inc. a Delaware corporation (the " Company "), Fortress Credit Co LLC as collateral agent (the " Collateral Agent "), each Person listed on Schedule I attached hereto (collectively, together with their successors and assigns, the "Investors" and as variously noted on Schedule I , the " Note Purchasers ", the " Fixed Return Interest Purchasers " and the " Contingent Interest Purchasers "), and for purposes of Section 8.2.2 only, Document Security Systems, Inc., a New York corporation (" DSS ").

## RECITALS

WHEREAS, the Company has requested a series of advances from the Investors, and, subject to the satisfaction of the conditions precedent set forth in Article V , the Investors have agreed to purchase (x) upon the occurrence of the Initial Closing Date, the Contingent Interest and the Fixed Return Interests and Notes set forth on Schedule 2.1 for an aggregate purchase price of $2,000,000 (collectively, the " Initial Advance "), (y) upon the occurrence of the First Milestone Closing Date, the Notes and Fixed Return Interests set forth on Schedule 2.2 for an aggregate purchase price of $1,000,000 (collectively, the " First Milestone Advance ") and (z) upon the occurrence of the Second Milestone Closing Date, the Notes and Fixed Return Interests set forth on Schedule 2.3 for an aggregate purchase price of $1,500,000 (collectively, the " Second Milestone Advance ", and, together with the Initial Advance and the First Milestone Advance, the " Advances ");

NOW THEREFORE, in consideration of the mutual agreements contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

## ARTICLE I
## DEFINITIONS

1.1.    Certain Defined Terms . Capitalized terms used in this Agreement and not otherwise defined shall have the meanings set forth in Appendix I .

1.2.    Other Interpretative Provisions . Unless otherwise specified, all references to "$", "cash", "dollars" or similar references shall mean U.S. dollars, paid in cash or other immediately available funds. The definitions set forth in this Agreement are equally applicable to both the singular and plural forms of the terms defined. The words " *hereof* ", " *herein* " , and " *hereunder* " and words of like import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement. All references to time of day herein are references to New York, New York time (daylight or standard, as applicable) unless otherwise specifically provided. Where the character or amount of any asset or liability or item of income or expense is required to be determined or any consolidation or other accounting computation is required to be made for the purposes of this Agreement, it shall be done in accordance with GAAP except where such principles are inconsistent with the specific provisions of this Agreement. References in this Agreement to an Appendix, Exhibit, Schedule, Article, Section, clause or subclause refer (A) to the appropriate Appendix, Exhibit or Schedule to, or Article, Section, clause or subclause in, this Agreement or (B) to the extent such references are not present in this Agreement, to the Document in which such reference appears. The term "including" is by way of example and not limitation. The word "or" is not exclusive. In the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including"; the words "to" and "until" each mean "to but excluding"; and the word "through" means "to and including." The term "documents" includes any and all instruments, documents, agreements, certificates, notices, reports, financial statements and other writings, however evidenced, whether in physical or electronic form. All references to any Person shall be constructed to include such Person's successors and assigns (subject to any restriction on assignment set forth herein). Unless otherwise expressly provided herein, references to any law shall include all statutory and regulatory provisions consolidating, amending, replacing, supplementing or interpreting such law.

      5.3.2.   <u>Officer's Certificate</u>. The Investors shall have received a certificate, dated the Second Milestone Closing Date and signed by an Authorized Officer of the Company, certifying that (x) the representations and warranties contained in this Agreement and the other Documents are true and correct in all material respects as of the Second Milestone Closing Date, except to the extent such representations and warranties expressly relate to an earlier date, in which case they are true and correct in all material respects as of such earlier date and except that any representation and warranty that is qualified as to "materiality," "Material Adverse Effect" or similar language is true and correct (after giving effect to any qualification therein) in all respects and (y) there shall exist no Default or Event of Default as of the Second Milestone Closing Date, including after giving effect to the making of the Second Milestone Advance; and

      5.3.3.   <u>Commitment Expiration</u>. The Second Milestone Closing Date shall have occurred on or prior to the second anniversary of the Initial Closing Date.

## ARTICLE VI
## REPRESENTATIONS AND WARRANTIES

In order to induce each of the other parties hereto to enter into this Agreement and the Investors to make the Advances, the Company hereby represents and warrants to the Investors as follows, in each case, except as expressly stated, as of each Closing Date:

      6.1.   <u>Organization and Business</u>. The Company is (a) a duly organized and validly existing corporation or limited liability company, (b) in good standing under the laws of the jurisdiction of its incorporation or organization and (c) has the power and authority, corporate or otherwise, necessary (i) to enter into and perform this Agreement and the Documents to which it is a party and (ii) to carry on the business now conducted or proposed to be conducted by it.

      6.2.   <u>Qualification</u>. The Company is duly and legally qualified to do business as a foreign corporation or limited liability company and is in good standing in each state or jurisdiction in which such qualification is required and is duly authorized, qualified and licensed under all laws, regulations, ordinances or orders of public authorities, or otherwise, to carry on its business in the places and in the manner in which it is conducted.

      6.3.   <u>Operations in Conformity with Law, etc</u>. The operations of the Company as now conducted or proposed to be conducted are not in violation of, nor is the Company in default under, any Legal Requirement.

      6.4.   <u>Authorization, Enforceability and Non-Contravention</u>. The Company has taken all corporate, limited liability or other action required to execute, deliver and perform this Agreement and each other Document. This Agreement and each other Document constitutes the legal, valid and binding obligation of the Company and is enforceable against the Company in accordance with their terms, except as enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally and subject to general principles of equity and principles of good faith and fair dealing, regardless of whether considered in a proceeding in equity or at law. All necessary consents, approvals and authorizations of any governmental or administrative agency or any other Person of any of the transactions contemplated hereby shall been have been obtained and shall be in full force and effect. This Agreement and each other Document does not (i) contravene the terms of any of the Company's Organization Documents, (ii) conflict with or result in any breach or contravention of, or the creation of any Lien under, or require any payment to be made under (x) any Contractual Obligation of the Company or (y) any material order, injunction, writ or decree of any governmental authority or any arbitral award to which the Company is subject or (iii) violate any Legal Requirement.